# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
                              :

IN RE AMBAC FINANCIAL GROUP, INC. :   Case No. 11-cv-07529-UA
                              :
                              :

-------------------------------------------------------x

## POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT'S BRIEF IN SUPPORT OF ITS APPEAL OF THE AMENDED 9019 ORDER

**KOHN, SWIFT & GRAF, P.C.**
Denis F. Sheils
Barbara L. Moyer
One South Broad Street, Suite 2100
Philadelphia, PA 19107

**CHIMICLES & TIKELLIS LLP**
Pamela S. Tikellis
Scott M. Tucker
222 Delaware Avenue
P.O. Box 1035
Wilmington, DE  19899
(302) 656-2500

*Attorneys for the Police and Fire*
*Retirement System of the City of Detroit*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Daniel W. Krasner
Demet Basar
Malcolm T. Brown
270 Madison Avenue
New York, NY  10016
(212) 545-4600

**THE MILLER LAW FIRM, P.C.**
Brian E. Etzel
950 West University Drive, Suite 300
Rochester, MI  48307

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ............................................................... 1

II.     BASIS FOR APPELLATE JURISDICTION ....................................... 2

III.    STATEMENT OF ISSUES PRESENTED............................................ 2

IV.     STANDARD OF REVIEW ................................................................. 4

V.      STATEMENT OF THE CASE............................................................. 4

        A.     Factual Background ................................................................. 4

        B.     Procedural History ................................................................. 5

VI.     LEGAL ARGUMENT......................................................................... 7

        A.     The Bankruptcy Court Erred by Approving the Securities Class Action
               Settlement Because the Scope of the Release is Impermissibly Broad ...... 7

        B.     The Bankruptcy Court Erred in Overruling PFRS' Objections Because
               Ambac has Abandoned the Derivative Claims ............................................. 8

        C.     The Bankruptcy Court Erred by Finding that the Decisions Made by the
               Ambac Directors to Release the Derivative Claims Were Entitled to
               Protection Under the Business Judgment Rule ............................................. 9

               1.     The Creditors Committee's Approval of the Securities Class
                      Action Settlement Did Not Cure the Conflicts of the Director
                      Defendants ................................................................................. 11

               2.     Defendants Failed to Present Competent Evidence at the Hearing
                      Held on September 8 and 9 ........................................................ 13

        D.     The Bankruptcy Court Erred By Applying an Incorrect Standard When It
               Overruled PFRS' Objections And Entered An Order Releasing, Barring
               and Dismissing PFRS' Derivative Claims ................................................. 14

               1.     The *Citigroup* Decision is Distinguishable.................................... 16

        E.     The Bankruptcy Court Erred when it Asserted the Constitutional Authority
               to Determine the Derivative Claims ........................................................... 17

VII.    CONCLUSION.................................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Aetna Cas. & Sur. Co. v. LTV Steel Co.*
94 F.3d 772 (2d Cir. 1996)........................................................................4

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)..........................................................................15, 16

*In re Ambac Financial Group, Inc. Derivative Litigation,*
08-cv-854 (S.D.N.Y.)................................................................ *passim*

*In re Ambac Financial Group, Inc.,*
No. 08-cv-411-NRB (S.D.N.Y.) .............................................. *passim*

*In re Ambac Financial Group, Inc. Sec. Litig.,*
693 F. Supp. 2d 241 (S.D.N.Y. 2010)....................................................3

*In re Biopure Corp. Derivative Litig.,*
424 F. Supp. 2d 305 (D. Mass. 2006) ...................................................17

*In re Gen. Growth Properties, Inc.,*
426 B.R. 71 (Bankr. S.D.N.Y. 2010)......................................................8

*In re Tower Auto. Inc.,*
241 F.R.D. 162 (S.D.N.Y. 2006) ...........................................................4

*iXL Enterprises, Inc. v. GE Capital Corp.,*
167 F. App'x. 824 (2d Cir. 2006) ...........................................................8

*Motorola, Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase
Bank, N.A.,*
478 F.3d 452 (2d Cir. 2007)............................................................3, 15

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.,*
660 F.2d 9 (2d Cir. 1981).............................................................2, 7, 8

*Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC),*
423 F.3d 166 (2d Cir. 2005)....................................................................8

*Stern v. Marshall,*
131 S. Ct. 2594 (2011).........................................................3, 4, 17, 18

*Tolin v. Ambac,*
No. 08-cv-11241-CM (S.D.N.Y.) ......................................... *passim*

STATE CASES

*Aronson v. Lewis,*
    473 A.2d 805 (Del. 1984) ........................................................................16, 17

*In re Citigroup Inc. S'holder Deriv. Litig.,*
    964 A.2d 106 (Del. Ch. 2009).................................................................16, 17

*In re: Ambac Financial Group, Inc. Shareholders Derivative Litig.,*
    C.A. No. 3521-VCL (Del. Ch.)............................................................ *passim*

*Parfi Holding AB v. Mirror Image Internet, Inc.,*
    817 A.2d 149 (Del. 2002) ...............................................................................19

FEDERAL STATUTES

28 U.S.C. § 157(b)(2) .............................................................................................18

28 U.S.C. § 158(a)(1).................................................................................................2

28 U.S.C. § 1334(c)(2)......................................................................................18, 19

11 U.S.C. § 105(A) ..................................................................................................1

11 U.S.C. § 362.........................................................................................................5

RULES

Bankruptcy Rule 9019 (A)..............................................................................1, 8, 9

Del. Ch. Ct. R. 12(b)(6) .........................................................................................15

Fed. R. Civ. P. 12(b)(6)...........................................................................................15

CONSTITUTIONAL PROVISIONS

U. S. Const. art. III ..............................................................................................6, 18

Plaintiff-Appellant Police and Fire Retirement System of the City of Detroit ("PFRS"), one of the plaintiffs in *In re: Ambac Financial Group, Inc. Shareholders Derivative Litigation*, C.A. No. 3521-VCL (Del. Ch.) (the "Delaware Action") respectfully submits this memorandum of law in support of its appeal to this Court from the Amended Order, Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 9019, (A) Approving the Settlement Stipulation and the Insurer Agreement and (B) Approving Ambac's Entry into the Settlement Stipulation and the Insurer Agreement and Performance of all of Its Obligations Thereunder (the "Amended 9019 Order") issued by the Bankruptcy Court for the Southern District of New York on September 13, 2011, *In re Ambac Financial Group, Inc.*, Chapter 11 Case, 10-15973-SCC, Dkt No. 558 (Bankr. S.D.N.Y.).

## I.   PRELIMINARY STATEMENT

The Bankruptcy Court erred in overruling PFRS' objections and issuing the Amended 9019 Order.  The Bankruptcy Court committed reversible error upon the following grounds:

- The scope of the release is overly broad and releases claims that were not and could not have been asserted in the securities class action;

- Ambac abandoned the derivative claims and PFRS has standing to pursue the claims on behalf of the Ambac bankruptcy estate;

- The director defendants' decision to approve the securities class action settlement is not protected by the business judgment rule because the Ambac directors are irreconcilably conflicted;

- The Bankruptcy Court applied an incorrect standard when it required PFRS to show a likelihood of success on the merits; and

- The Bankruptcy Court lacked Article III authority to finally determine the derivative claims.

## II.    BASIS FOR APPELLATE JURISDICTION

This Court has jurisdiction over this appeal from the Bankruptcy Court's Amended 9019 Order, dated September 13, 2011, approving the Securities Class Action Settlement, Bankr. Dkt No. 558, under 28 U.S.C. § 158(a)(1).

## III.    STATEMENT OF ISSUES PRESENTED

1)      Whether the Bankruptcy Court erred in issuing the Amended 9019 Order, when the release contained overly broad language that releases the derivative claims asserted in the Delaware Action and *In re Ambac Financial Group, Inc. Derivative Litigation,* 08 Civ. 854 (S.D.N.Y.) (the "New York Action" and together with the Delaware Action, the "Derivative Actions").

2)      Whether the entry of the Amended 9019 Order releasing, barring, and dismissing the claims in the Derivative Actions, which were filed prior to Ambac Financial Group, Inc.'s ("Ambac" or the "Debtor") bankruptcy filing, violated the standard set forth in *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981).

3)      Whether the Bankruptcy Court erred in ruling that the release and bar of the claims in the Derivative Actions for no consideration as part of the settlement of the securities class action styled: *In re Ambac Financial Group, Inc.*, No. 08-cv-411-NRB (S.D.N.Y.), and *Tolin v. Ambac*, No. 08-cv-11241-CM (S.D.N.Y.) (the "Securities Class

Action"), which asserted claims under the Securities Exchange Act of 1934 ("Exchange Act") against Ambac and certain of its directors and officers, was proper.

4)      Whether the Bankruptcy Court applied an incorrect standard when it overruled PFRS's objections and entered an order releasing, barring and dismissing PFRS's derivative claims.

5)      Whether the Bankruptcy Court erred in ruling that the District Court's decision in the Securities Class Action, which sustained the Securities Class Action Plaintiffs' Exchange Act claims against Ambac and certain of its directors and officers (*see In re Ambac Financial Group, Inc. Sec. Litig.,* 693 F. Supp. 2d 241 (S.D.N.Y. 2010)), was "largely irrelevant" to assessing the likelihood of success of the claims in the Derivative Actions.

6)      Whether the Bankruptcy Court erred in ruling that the decision to approve the Securities Class Action Settlement made by the Ambac board of directors and the Creditors Committee was protected by the business judgment rule.

7)      Whether the Bankruptcy Court erred in finding the Securities Class Action Settlement satisfied the *Iridium* factors.

8)      Whether the Bankruptcy Court erred in finding that PFRS's standing as a party in interest in the bankruptcy sense was "tenuous at best." Bankr. Dkt No. 582, at 6 (the "Bench Decision"), attached as Exhibit A.

9)      Whether the Bankruptcy Court erred when it asserted the constitutional authority to determine whether Ambac correctly decided to dismiss the Derivative Actions in light of the United States Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011).

## IV.   STANDARD OF REVIEW

On appeal, the Bankruptcy Court's legal and factual determinations are reviewed *de novo*. *Stern v. Marshall*, 131 S. Ct. 2594, 2604 (2011) ("[i]t is the district court that enters final judgment in such cases after reviewing *de novo* any matter to which a party objects"); *In re Tower Auto. Inc.*, 241 F.R.D. 162, 166 (S.D.N.Y. 2006) (collecting cases); *see also Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.)*, 94 F.3d 772, 780 (2d Cir. 1996).

## V.   STATEMENT OF THE CASE

### A.   Factual Background

On February 13, 2008, PFRS filed the Delaware Action.  On May 7, 2008 PFRS filed an Amended Consolidated Complaint (the "Complaint").  The Complaint alleges that the directors and officers of Ambac breached their fiduciary duties by, among other things, deciding to radically change Ambac's core business model from insuring conservative municipal bonds to insuring unreasonably risky credit default swaps ("CDS") containing collateralized debt obligations ("CDOs") and CDOs comprised of other CDOs, known as "CDO$^2$s" with exposure to residential mortgage backed securities ("RMBS").

Ambac's AAA rating was its lifeblood and retaining this rating was key to Ambac's future.  The Complaint alleges that the directors and officers of Ambac intentionally began insuring risky CDS contracts to capture short term gains while knowingly jeopardizing Ambac's AAA rating and breaching their fiduciary duties to Ambac and its shareholders.  As a result of these breaches of fiduciary duties, Ambac has, among other things, lost its prized AAA rating, suffered billions of dollars of losses,

4

become the subject of an investigation by a state attorney general and has filed for bankruptcy.

**B.    Procedural History**

On December 30, 2008 Vice Chancellor Lamb stayed the Delaware Action in favor of the New York Action.  On January 20, 2009, PFRS moved to intervene in the New York Action, but its motion to intervene was denied.  On November 8, 2010 Ambac filed for Chapter 11 Bankruptcy in the Southern District of New York.  As such, a mandatory stay pursuant to Section 362 of the Bankruptcy Code was imposed on the New York Action and all other actions.  On November 10, 2010, the District Court dismissed the New York Action without prejudice to re-file once the Section 362 stay was lifted.

On June 28, 2011, Ambac submitted its motion to approve the Securities Class Action Settlement to the Bankruptcy Court.  Approval of the Securities Class Action Settlement was conditioned upon the Bankruptcy Court approving a release that not only bars and releases the claims asserted in the Securities Class Action, but also the derivative claims asserted by PFRS in the Delaware Action.  Defendants made representations to the Bankruptcy Court that all affected parties had received notice and the Bankruptcy Court entered an order approving the settlement, the "9019 Order," on July 19, 2011.  However, PFRS had not been served with the notice of the Bankruptcy Court proceedings with respect to the Securities Class Action Settlement, which purported to be releasing its claims, and no Notice of Bankruptcy had been filed with the Chancery Court.  When PFRS was advised of the entry of the 9019 Order, PFRS notified the Bankruptcy Court by letter and filed objections advising the Court that it had not received notice and intended to raise objections.  PFRS sent a letter to the Bankruptcy

Court and filed an Objection on July 27, 2011.  PFRS filed a Supplemental Objection on August 5, 2011.  The Bankruptcy Court held a hearing on August 10, 2011, and scheduled further proceedings for September 8.  PFRS filed a Pre-Hearing Submission on September 6, 2011.  On September 8 and 9, 2011, the Bankruptcy Court held an evidentiary hearing.  On September 13, 2011 the Bankruptcy Court issued a bench decision approving the Amended 9019 Order, which was docketed on Sept 23, 2011, Bankr. Dkt. No 582, attached as Ex. A.  On September 26, 2011, PFRS filed its Notice of Appeal of the Amended 9019 Order to this Court.

PFRS also filed objections to the Securities Class Action Settlement asserting, among other things, that members of the board of directors who decided to release the derivative claims were irreconcilably conflicted, that the release provided for as part of the settlement was overly broad, and that the Bankruptcy Court did not have Article III authority over the derivative claims.  On September 28, 2011, the Court held a final fairness hearing on the Securities Class Action Settlement.  Counsel for PFRS appeared and argued its objections to the Securities Class Action Settlement.  The District Court approved the Securities Class Action Settlement over PFRS's objections.  On October 28, 2011, PFRS filed a Notice of Appeal of the Securities Class Action Settlement to the Court of Appeals for the Second Circuit.

PFRS also submitted proofs of claim to the Bankruptcy Court.  On September 21, 2011, Ambac moved to disallow and expunge PFRS's claims.  Bankr. Dkt No. 573.  On October 12, 2011 PFRS submitted an objection to Ambac's motion.  On October 26, 2011 the Bankruptcy Court held a hearing on the motion.  Counsel for PFRS appeared and asserted PFRS's objections.  The Bankruptcy Court granted Ambac's motion and

expunged PFRS's claims.  Bankr. Dkt No. 668.  PFRS intends to file an appeal from this order.

## VI.   LEGAL ARGUMENT

### A.   The Bankruptcy Court Erred by Approving the Securities Class Action Settlement Because the Scope of the Release is Impermissibly Broad

The Bankruptcy Court erred in entering the Amended 9019 Order because the Securities Class Action Settlement contains overly broad releases.  In this Circuit, settlements containing releases that are too broad have been rejected.  For example, in *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9, 18-19 (2d Cir. 1981), the Court held that the plaintiff could not release claims as a part of a class action settlement that were not brought by the plaintiff.  The court stated that "the parties to the settlement have attempted to release claims with respect to which none of them was authorized to represent members of the class." *Id.*  Here, the directors of Ambac named in the Derivative Actions (the "Director Defendants") are attempting to release claims on behalf of the derivative plaintiffs that were not and could not have been asserted in the Securities Class Action, and which a final judgment in that case would not have extinguished.  Thus, "[i]f a judgment after trial cannot extinguish claims not asserted in the class action complaint, a judgment approving a settlement in such an action ordinarily should not be able to do so either." *Id.* at 18.  The Court also observed that "[a]n advantage to the class, no matter how great, simply cannot be bought by the uncompensated sacrifice of claims of members, whether few or many, which were not within the description of claims assertable by the class." *Id.* at 19.  Under the principle of *Super Spuds*, the derivative claims should not have been released and the Bankruptcy

7

Court erred by finding that "the injunctions and releases being given through the proposed settlement are appropriate in nature and scope" and approving the Securities Class Action Settlement.  Bench Decision at 12.

**B.**     **The Bankruptcy Court Erred in Overruling PFRS' Objections Because Ambac has Abandoned the Derivative Claims**

Ambac has essentially abandoned the derivative claims.  As such, PFRS has standing to pursue the claims on behalf of Ambac's bankruptcy estate.  The Second Circuit has ruled that a shareholder plaintiff has standing to request permission from the Bankruptcy Court to continue to pursue a derivative action on behalf of the bankrupt entity.  *See iXL Enterprises, Inc. v. GE Capital Corp.*, 167 F. App'x. 824, 826-27 (2d Cir. 2006) ("the Bankruptcy Code provides that a shareholder may, in limited circumstances, pursue a derivative action on behalf of the bankrupt"); *In re Gen. Growth Properties, Inc.*, 426 B.R. 71, 76 (Bankr. S.D.N.Y. 2010) (a shareholder may assert a derivative claim after it has petitioned and received approval from the bankruptcy court).

Recognizing that conflicts of interest may warrant allowing someone other than the debtor-in-possession to pursue claims that are property of the estate, the Second Circuit explained in *Smart World Techs., LLC v. Juno Online Servs. (In re Smart World Techs., LLC)*, 423 F.3d 166, 177 (2d Cir. 2005)(emphasis added), that:

> As an initial matter, we note that derivative standing in the Rule 9019 context is not merely the mirror image of a typical derivative standing case, but is conceptually distinguishable. **In our view, there is an important difference between pursuing an otherwise neglected claim and settling a claim that the estate is trying to pursue. The former usually involves a claim against the debtor's principals themselves, who refuse to litigate out of self interest. *See, e.g.,* Cybergenics, 330 F.3d at 573; STN, 779 F.2d at 902.  Derivative standing in such a case may be necessary to avoid the inherent conflict of interest that exists**

**when those with the power to pursue a claim are those who may be the target of such a claim.** In the <u>Rule 9019</u> context, by contrast, it is the debtor and its principals who seek to pursue a claim on behalf of the estate, which is precisely the role of the debtor-in-possession envisioned by the Code. In such circumstances, we think it less likely that the debtor's principals will be motivated by reasons that conflict with the best interests of the estate. On the contrary, it is more likely that allowing creditors and other parties to bring <u>Rule 9019</u> motions over a debtor's objection will encourage parties against whom the estate has a valid claim to delay and obstruct litigation, in the hopes that a creditor with a small interest in the estate will eventually propose a settlement disposing of the estate's valuable causes of action at a low price. The possibility of such perverse dynamics suggests that derivative standing will be appropriate much less frequently in the <u>Rule 9019</u> context than in the usual case (*i.e.,* where the would-be derivative plaintiff wishes to pursue a claim). **We thus emphasize that a debtor-in-possession pursuing litigation is much less likely to be acting for reasons antithetical to the interests of the estate than a debtor-in-possession who refuses to sue its own principals;** accordingly, a party who seeks to displace the debtor faces a heavier burden in the former case than in the latter.

The Director Defendants have refused to litigate the derivative claims out of self interest and PFRS should be permitted to pursue the Delaware Action on behalf of Ambac. PFRS sought leave of the Bankruptcy Court to pursue the Delaware Action on behalf of Ambac once PFRS became aware of the Director Defendants' intention to dismiss the Delaware Action. The bankruptcy court erred when it was "unable to find the presence of rare circumstances which would make derivative standing appropriate here for the Derivative Plaintiffs." Bench Decision at 4.

Importantly, while the irreconcilably conflicted Director Defendants purported to settle the derivative claims under the Securities Class Action Settlement, they can be viewed as having abandoned them. By releasing the claims, Ambac has abandoned the derivative claims and signaled its intent not to pursue them.

**C.     The Bankruptcy Court Erred by Finding that the Decisions Made by the Ambac Directors to Release the Derivative Claims Were Entitled to Protection Under the Business Judgment Rule**

The Bankruptcy Court erred by finding that the decisions made by the Ambac directors were entitled to protection under the business judgment rule. A key fact that the Bankruptcy Court failed to give due weight to is that the Director Defendants remain in control of Ambac. Because Ambac is operating as a debtor-in-possession, an independent trustee was not appointed. The cases Ambac relied upon in the bankruptcy proceedings below for the proposition that Ambac has control over the derivative claims involve an independent trustee in control of the bankruptcy estate who is capable of making an independent decision on whether to pursue derivative claims. Here, the fact that the conflicted Director Defendants remain in control and were responsible for deciding to dismiss the very claims asserted against them should obviate business judgment rule protection.

PFRS noted in its Objections to the Amended 9019 Order that seven of the defendants in the Delaware Action are currently on the Board of Ambac: Michael A. Callen, Jill M. Considine, Philip N. Duff, Laura S. Unger, Thomas C. Theobold, Henry D. G. Wallace and David W. Wallis. Defendants Callen, Considine, Duff, Theobald, Unger and Wallace were also members of the Audit and Risk Assessment ("ARA") Committee during the relevant time period, which positions required these Director Defendants to employ a heightened standard of oversight. Pursuant to the ARA Charter, the Audit Committee had the specific non-delegable duty to review: (1) risk assessment and management policies; (2) whether management was setting the appropriate control environment; and (3) disclosure controls.

The Complaint asserts that Director Defendants breached their fiduciary duties by systematically abdicating their non-delegable duty to monitor the risk exposure of the

Company. The Director Defendants failed to recognize and/or failed to act on certain red flags and caused Ambac to embrace a culture that emphasized insurance underwriting volume in foreseeable derogation of underwriting standards. The Director Defendants also made active decisions that recklessly exposed Ambac to risk, such as specifically deciding to insure CDOs and $CDO^2$s and other derivative securities backed by toxic subprime mortgage securities. The Director Defendants did this by insuring CDOs and $CDO^2$s through CDSs, and creating "transformers" to circumvent regulations that prohibit monoline insurers from insuring risky CDSs. The Director Defendants also are alleged to have made fraudulent misrepresentations, falsely representing that stringent underwriting guidelines, policies and procedures assured that the Company guarantees "only those obligations which are of investment grade quality with a remote risk of loss." The Director Defendants knowingly jeopardized the Company's AAA ratings for short term gains. Because of these allegations, the Director Defendants face serious personal liability as a result of the Derivative Actions and are irreconcilably conflicted.

### 1.   The Creditors Committee's Approval of the Securities Class Action Settlement Did Not Cure the Conflicts of the Director Defendants

In reaching its decision to approve the Amended 9019 Order, the Bankruptcy Court found that the Creditors Committee's approval of the Securities Class Action Settlement reinforced the Court's conclusion that that the Director Defendants' business judgment to settle and release the derivative claims was valid, regardless of the alleged conflicts. The bankruptcy court stated "[n]otwithstanding the Derivative Plaintiffs' arguments and observations about the possible conflicting interests of the Debtor's Board

members and their counsel, I find that the Creditors' Committee serves as a very reliable check on the business judgment of the Debtor." Bench Decision at 11. However, the Creditors Committee was not involved in the negotiations of and finalization of the settlement. The settlement proposal, negotiated and approved by the Director Defendants, Ambac and the D&O Insurers and their respective counsel, was presented to the Creditors Committee in its final form. It was the Director Defendants and their attorneys who were involved in structuring the terms of the settlement. When asked when the settlement was presented to the Creditors Committee, Stephen M. Ksenak, Ambac's witness, responded: "So, for the first time, I believe they were presented with the agreement in principle in the summer of 2010." Sept. 8, 2011 Hr'g Tr. 71:9-10.

The Creditors Committee relied on the Director Defendants' and the Director Defendants' attorneys' judgment, not the other way around. Furthermore, at the Bankruptcy Hearing, the Creditors Committee failed to proffer any witness or evidence that showed or discussed the process it undertook to evaluate the merits or value of the Derivative Actions.[1] Therefore the Creditors Committee's approval of the settlement did not cure the conflicts that permeated the Director Defendants' decision to dismiss the Derivative Actions as part of the Securities Settlement, and the Bankruptcy Court's reliance on the approval of the Creditors' Committee as a check is wholly misplaced.

---

[1] The Creditors Committee is represented by Morrison Foerster. On the firm's website it states that: "We have defended hundreds of companies and their officers, directors, underwriters, lawyers, and accountants in more than 1,000 securities litigation matters, including hundreds of class actions … We have defended companies and their officers and directors in federal and state derivative actions." Therefore, even though Morrison Foerster represents the Creditors Committee, it is a corporate defense firm. Even Mr. Ksenak, Ambac's sole witness could not identify even one case in which Morrison Foerster represented a plaintiff shareholder in a derivative case. Sept. 8, 2011 Hr'g Tr. 74:21-23.

2.      **Defendants Failed to Present Competent Evidence at the
        Hearing Held on September 8 and 9**

At the September 8 and 9 hearing, Ambac proffered Mr. Ksenak, Senior

Managing Director and General Counsel to Ambac, as a witness. Mr. Ksenak, however,

was not able to provide competent evidence because he had no personal knowledge of

any of the events about which he testified. In any event, the testimony of Stephen M.

Ksenak confirms that Ambac did not conduct any due diligence into the potential value of

the derivative claims.

Mr. Ksenak took over the role of General Counsel in July 30, 2011, less than two

months before the hearing. Mr. Ksenak did not even become involved in this matter until

the August 10, 2011 hearing in the Bankruptcy Court. Mr. Ksenak testified that his

predecessor, Kevin Doyle, who was General Counsel during the relevant time period and

who possessed first hand knowledge, was unavailable and "not interested in continuing to

be engaged in company business and company affairs." Sept. 8, 2011 Hr'g Tr. 57:18-19.

Because Mr. Ksenak had no personal knowledge, he learned of the events from

third parties. Mr. Ksenak testified that: "[t]he basis of my knowledge is conversations

with Mr. Doyle who did participate in [the settlement] process; conversations with

lawyers from Wachtell Lipton; conversations with lawyers from Dewey & LeBoeuf, and

my own review of some of the materials relating to the mediation and settlement."

On cross examination, Mr. Ksenak was asked:

"Did you satisfy yourself in the course of that review that
counsel had in fact engaged in a rigorous review of the
underlying facts and analysis of the legal basis for the
claims and potential recoveries?"

Mr. Ksenak responded:

> "Yes. I was satisfied with what I heard about the review
> that had been conducted primarily lawyers from Wachtell
> Lipton, who recounted for me the process they went
> through in investing the facts that could reflect to or that it
> did relate to the claims, which led them to the view that the
> claims lacked merit."

Sept. 8, 2011 Hr'g Tr. 159:3-11.

Mr. Ksenak's testimony regarding insider trading allegations also highlights the

influence the Director Defendants' attorneys played in ensuring the dismissal of the

Derivative Actions. The New York Action contains allegations of insider trading by the

Director Defendants totaling over $131 million during the relevant time period. When

asked about this, Mr. Ksenak stated:

> "I spoke to Mr. Doyle about that and to the lawyers from
> Wachtell Lipton about that. They informed me about their
> investigation into the facts. And what I found out was that
> they examined the stock trading activity of the individuals
> listed in the complaint, discovered that the complaint only
> mentioned stock sales, not stock purchases. There were
> purchases made by some of the defendants."

Sept. 8, 2011 Hr'g. Tr 160:15-21. Mr. Ksenak relied upon statements from the Director

Defendants' attorneys that the claims against the Director Defendants lacked merit.

Despite the obvious bias, the Bankruptcy Court did not question this process.

**D.     The Bankruptcy Court Erred By Applying an Incorrect Standard
When It Overruled PFRS' Objections And Entered An Order
Releasing, Barring and Dismissing PFRS' Derivative Claims**

The Bankruptcy Court erred by applying an incorrect standard when it overruled

PFRS' objections and entered an Order releasing, barring and dismissing PFRS'

derivative claims. The Delaware Action was commenced over three and one-half years

prior to Ambac's filing of its bankruptcy petition. During that period, neither the New

York Action nor the Delaware Action were dismissed. On a motion to dismiss, the

14

claims asserted in the Derivative Actions would be reviewed under the standards set forth in Fed. R. Civ. P. 12(b)(6) or Delaware Court of Chancery Rule 12(b)(6).  At least in federal court, the "plausibility standard" articulated in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) would be applied in deciding whether a complaint has been properly pled.  However, since the release of the Derivative Actions was improperly incorporated into the Securities Class Action Settlement, the Bankruptcy Court applied the *Iridium* factors.  Bench Decision at 5.  *Motorola, Inc. v. Official Comm. Of Unsecured Creditors and JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC)*, 478 F.3d 452 (2d Cir. 2007).  The Bankruptcy Court erroneously assessed the likelihood of success of these actions under the *Iridium* factors, when in fact, *Twombly* should have been applied.

It is also unclear what standard the Bankruptcy Court was applying even under the *Iridium* factors.  The Bankruptcy Court, at one point, purportedly under *Iridium*, was apparently holding the Derivative Actions to the standard needed to be met to obtain a preliminary injunction.  *See* Bench Decision at 8 ("Indeed, beyond pointing to the well-pled allegations of its complaint and the largely irrelevant fact that the complaint in the Securities Litigation survived a Motion to Dismiss in the District Court, PFRS has entirely failed to address the issue of likelihood of success on the merits of the derivative claims.").  At another part of its opinion, the Bankruptcy Court asserts that Ambac "has made a substantial showing regarding its consideration of the merits of the claims proposed to be settled and the likelihood of success of those claims," Bench Decision at 6.  However, such an assertion is belied by its observations in other parts of the opinion that suggest that the Derivative Actions would be dismissed and barred even if Ambac

only provided "a plausible explanation." Bench Decision at 8. (Finding that PFRS's insider trading claims were meritless on the basis of Mr. Ksenak providing "a plausible explanation" for the timing of the stock sales by Ambac's officers and directors). If PFRS has submitted an equally plausible explanation, the court could not, at least under the standards for a motion to dismiss set forth in *Twombly*, dismiss PFRS's derivative claims.

### 1.   The *Citigroup* Decision is Distinguishable

In its Bench Decision, the Bankruptcy Court cites to *In re Citigroup Inc. S'holder Deriv. Litig.*, 964 A.2d 106 (Del. Ch. 2009) for the proposition that "there exist high barriers to recovery under Delaware law on the theoretical claims against Ambac's officers and directors which are to be released as part of the proposed settlement." Bench Decision at 6. However, this case is different from *Citigroup* because PFRS challenges specific board actions that destroyed Ambac's future, which implicate the pleading standards set forth in *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984). When challenging a board's *inaction,* a plaintiff must "allege particularized facts that create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *In re Citigroup*, 964 A.2d at 120 (internal citation omitted). When a plaintiff challenges an *action* of the board, however, the plaintiff need only provide particularized factual allegations that raise a reasonable doubt that "(1) the directors are disinterested and independent [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment" *Id.* (citing *Aronson*, 473 A.2d at 814).

In *Citigroup*, the chancery court rejected the failure of oversight claims asserted against Citigroup's directors as a result of conclusory allegations that were lacking in factual particularity. *Id.* Specifically, the "red flags" alleged in the Citigroup complaint "amount[ed] to little more than portions of public documents that reflected the worsening conditions in the subprime mortgage market and in the economy generally." *Citigroup*, 964 A.2d at 128. Unlike *Citigroup*, PFRS' Complaint contains specific allegations detailing the actions taken by the Director Defendants which jeopardized the future of the Company. PFRS alleges that the Director Defendants fundamentally changed Ambac's core business so that Ambac could wrap risky structured finance products with its debt ratings. While Ambac had no prior loss experience with these inherently risky products, the Director Defendants allowed the Company to insure them without establishing any reserves for them. *See In re Biopure Corp. Derivative Litig.,* 424 F. Supp. 2d 305, 308 (D. Mass. 2006) ("[I]n cases in which a company's primary product or service is in jeopardy, courts have been willing to impute that knowledge to the company's officers and directors"). Because PFRS' complaint alleges specific actions, as opposed to *inaction* alleged in *Citigroup*, the more permissive pleading standards of *Aronson* apply and the "high barriers to recovery" that the Director Defendants incorrectly asserted apply are instead much lower.

### E.   The Bankruptcy Court Erred when it Asserted the Constitutional Authority to Determine the Derivative Claims

The Court erred in asserting that it had constitutional authority to determine the derivative claims. In *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the Supreme Court discussed whether a bankruptcy court has authority to determine a related state law matter. In *Stern*, a widow brought an adversary proceeding in her Chapter 11

bankruptcy case to recover for her stepson's alleged tortious interference with her expectancy of and inheritance from her deceased husband. The bankruptcy court entered judgment for the widow and the stepson appealed. After a series of appeals and remands the case reached the Supreme Court, which held that bankruptcy court lacked authority under Article III of the United States Constitution to enter final judgment on the widow's state law claim.

The Supreme Court found that while the bankruptcy court had statutory authority to determine a state law claim, it lacked the Constitutional authority to do so because the bankruptcy court is without Article III authority to hear and finally determine state law claims that seek to augment the bankruptcy estate. *Id.* at 2608. Likewise, the bankruptcy court lacks Article III authority to finally determine PFRS' state law breach of fiduciary duty clams. Since PFRS' state law claims are considered a statutory "core" matter under 28 U.S.C. § 157(b)(2), the bankruptcy court could not even issue proposed findings and conclusions. *Id.* at 2604.

Further, in *Stern*, Chief Justice Roberts cited to 28 U.S.C. § 1334(c)(2) which provides: "upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction." Therefore, under *Stern*, the proper forum to decide the state law claims that seek to augment the bankruptcy estate is the Delaware Court of Chancery. *Id.* at 2619-20 (citing 28 U.S.C. §

1334(c)(2)).  The Delaware Supreme Court has stated that "the right to vindicate breaches

of fiduciary duty . . . is a central doctrine of Delaware law.  …, [a plaintiff] has the right

to have the merits of those claims adjudicated by the Court of Chancery."  *Parfi Holding*

*AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 160 (Del. 2002) (emphasis added).

Because PFRS has the right to have the merits of its claims adjudicated by the Court of

Chancery, the bankruptcy court erred by approving the dismissal those claims without

affording PFRS the opportunity to be heard in state court.

## VII.   **CONCLUSION**

For the foregoing reasons, PFRS respectfully requests that the Court reverse the

Amended 9019 Order.

Dated: November 14, 2011                            Respectfully Submitted,


                                                    s/ Denis F. Sheils
                                                    Kohn, Swift & Graf, P.C.
                                                    Denis F. Sheils
                                                    Barbara L. Moyer
                                                    One South Broad Street, Suite 2100
                                                    Philadelphia, PA 19107

                                                    Wolf Haldenstein Adler Freeman & Herz
                                                    LLP
                                                    Daniel W. Krasner
                                                    Demet Basar
                                                    Malcolm T. Brown
                                                    270 Madison Avenue
                                                    New York, NY  10016
                                                    (212) 545-4600

                                                    Chimicles & Tikellis LLP
                                                    Pamela S. Tikellis
                                                    Scott M. Tucker
                                                    222 Delaware Avenue
                                                    P.O. Box 1035
                                                    Wilmington, DE  19899
                                                    (302) 656-2500

The Miller Law Firm, P.C.
Brian E. Etzel
950 West University Drive, Suite 300
Rochester, MI  48307

*Attorneys for the Police and Fire
Retirement System of the City of Detroit*

# Exhibit A

**FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

In re:                                    Chapter 11

Ambac Financial Group, Inc.,              Case No. 10-15973 (SCC)

                          Debtor.


-------------------------------------------------------------x

## BENCH DECISION APPROVING SETTLEMENT STIPULATION
## AND INSURER AGREEMENT[1]

A P P E A R A N C E S:

DEWEY & LeBOEUF LLP
*Attorneys for the Debtor*
1301 Avenue of the Americas
New York, NY 10019
By: Peter A. Ivanick, Esq.
    Richard W. Reinthaler, Esq.

One Embarcadero Center, Suite 400
San Francisco, CA 94111
By: Bennett G. Young, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Co-Counsel for the Debtor*
51 West 52nd Street
New York, NY 10019
By: Peter C. Hein, Esq.
    Christopher Lee Wilson, Esq.

---

[1]    This decision was dictated on the record of the hearing held on September 12, 2011.  It has been modified to include full citations and defined terms, and reflects minor additional non-substantive modifications.  The findings of fact and conclusions of law herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any finding of fact later shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law later shall be determined to be a finding of fact, it shall be so deemed.

1

MORRISON & FOERSTER LLP
*Attorneys for the Official Committee of Unsecured Creditors*
1290 Avenue of the Americas
New York, NY 10104
By: Anthony Princi, Esq.
    Jamie A. Levitt, Esq.
    Renee L. Freimuth, Esq.

KOHN SWIFT & GRAF, PC
*Attorneys for Police and Fire Retirement System of the City of Detroit*
One South Broad Street, Suite 2100
Philadelphia, PA 19107
By: Denis F. Sheils, Esq.
    Barbara L. Moyer, Esq.

WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP
*Attorneys for Police and Fire Retirement System of the City of Detroit*
270 Madison Avenue
New York, NY 10016
By: Gregory M. Nespole, Esq.
    Demet Basar, Esq.
    Malcom T. Brown, Esq.

LOWENSTEIN SANDLER PC
*Attorneys for Lead Plaintiffs and the Class in the Securities Litigation*
1251 Avenue of the Americas, 18th Floor
New York, NY 10020
By: Michael S. Etkin, Esq.

Before the Court is the Amended Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 (A) Approving the Settlement Stipulation and the Insurer Agreement and (B) Approving Ambac's Entry into the Settlement Stipulation and the Insurer Agreement and Performance of all of its Obligations Thereunder. The Court assumes familiarity with the background and history of the Ambac chapter 11 proceedings, as well as that of the Securities Litigation and Derivative Actions which are the subject of the proposed settlement.

**Procedural Background**

On June 28, 2011, Ambac Financial Group, Inc. (the "Debtor" or "Ambac") filed a motion (the "9019 Motion") seeking approval of its entry into the Settlement Stipulation and

2

Insurer Agreement. No objections were filed to the 9019 Motion, nor were any objections raised at the hearing held on July 19, 2011. After the hearing, the Court entered an order approving Ambac's entry into the Settlement Stipulation and the Insurer Agreement.

The Debtor subsequently informed the Court that the plaintiffs in the Derivative Actions[2] had not been served with the 9019 Motion. On July 25, 2011, the Debtor filed a notice of presentment of the Amended Order approving Ambac's entry into the Settlement Stipulation and the Insurer Agreement, which notice set an objection deadline of July 28, 2011. After objections to the Amended Order were received, the Court set August 10, 2011 as a hearing date on the Amended Order.

At the August 10 hearing, counsel for certain of the plaintiffs in the Derivative Actions appeared, pressed their objections, and requested that they be afforded an opportunity to conduct discovery and present evidence as to why the Settlement Stipulation and Insurer Agreement should not be approved over their objection. It bears noting that, prior to their filing objections to the entry of the Amended Order on July 27, 2011, none of the plaintiffs in the Derivative Actions had appeared or filed anything in this chapter 11 case, which has been pending since November 8, 2010; indeed, as of the date of this decision, no plaintiff has sought leave to pursue the Derivative Actions on behalf of the Ambac estate.

In response to the Derivative Plaintiffs' request, the Court set September 8 as the date for a third and final hearing on the Settlement Stipulation and Insurer Agreement in order to allow the parties a month's time to conduct limited discovery and file additional submissions. An evidentiary hearing on the Amended Order was held on September 8 and 9, 2011.

---

[2]    In re Ambac Financial Group, Inc. Shareholders Derivative Litigation, C.A. No. 3521-VCL (Del. Ch.) (the "Delaware Derivative Action"), In re Ambac Financial Group, Inc. Derivative Litigation, Case No. 08 Civ. 854 (SHS) (SDNY) (the "New York Derivative Action," and, together, the "Derivative Actions").

Of the filed objections, only the objections filed by (i) the Police and Fire Retirement System of the City of Detroit ("PFRS"), plaintiff in the Delaware Derivative Action, and (ii) Catherine Rubery, a plaintiff in the New York Derivative Action (together, the "Derivative Plaintiffs"), remain unresolved.  These objectors request that the Court vacate its July 19 order and reject the Amended Order to the extent that it releases and bars shareholder derivative claims.  PFRS also purports to seek this Court's authorization to pursue these derivative claims on behalf of the Debtor, but it has not filed a proper motion requesting standing.  The Derivative Plaintiffs have raised both procedural and substantive objections to the entry of the Amended Order.

On August 9, the Debtor filed a reply to the objections, which reply was joined by both the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the lead plaintiffs in the Securities Litigation.[3]  After the hearing on August 10, each of the parties filed supplemental pleadings.  On September 6, the Debtor filed its Supplemental Brief in Support of the Amended Order, which was accompanied by the Declaration of Stephen M. Ksenak, Senior Managing Director and General Counsel of the Debtor.  PFRS filed a Pre-Hearing Memorandum in Further Support of its objection, which was accompanied by the Expert Report of Lawrence A. Weiss.  At the hearing held on September 8, 2011, Mr. Ksenak testified, and Dr. Weiss testified at the continuation of the hearing on September 9, 2011.

**The Procedural Objections**

I begin with the procedural objections, which relate primarily to the lack of notice of the Debtor's 9019 Motion given to the Derivative Plaintiffs.  Notwithstanding the fact that it is unclear whether (i) the failure to provide notice to these parties was inadvertent or (ii) the Debtor

---

[3]     In re Ambac Fin. Group, Inc. Sec. Litig., No. 08-cv-411-NRB (SDNY) (consolidated) (the "Securities Litigation").

was required to give such notice, the Court overrules the procedural objections. The Derivative Plaintiffs have conceded that, regardless of what happened prior to the July 19 hearing, they received actual notice of this Court's entry of the order granting the 9019 Motion on July 20, 2011. July 20 was 21 days prior to the August 10 hearing and some 50 days prior to the September 8 hearing. Whatever deficiencies may have existed with respect to notice have been cured, and the Derivative Plaintiffs have now agreed that they have been afforded an opportunity to object and be heard on the merits. Accordingly, it is unnecessary for the Court to determine whether notice was actually required to be given to the Derivative Plaintiffs pursuant to this Court's Amended Case Management Order or otherwise.

**The Substantive Objections**

With respect to the substantive objections asserted by the Derivative Plaintiffs, the Court finds that, upon commencement of the Debtor's chapter 11 case, the derivative claims which are the subject of the Derivative Actions became property of the Debtor's estate. See, e.g., iXL Enters., Inc. v. GE Capital Corp., 167 F. App'x 824, 826 (2d Cir. 2006) (citations omitted). The Debtor has the sole authority to prosecute such claims or to seek Court approval to settle them pursuant to Bankruptcy Rule 9019. As the Second Circuit noted in Smart World Technologies, LLC v. Juno Online Servs., Inc., 423 F.3d 166, 175 (2d Cir. 2005), while authority to pursue a Rule 9019 motion may, in certain rare circumstances, be vested in parties to the bankruptcy proceeding other than the debtor, Rule 9019 primarily vests authority to settle or compromise solely in the Debtor. Based on the facts before me, I find that the Debtor and its Board (with the support of the Creditors' Committee) have appropriately valued the merits of the securities action and the derivative claims encompassed in the settlement, and I am unable to find the

presence of rare circumstances which would make derivative standing appropriate here for the Derivative Plaintiffs.

For the reasons set forth below, moreover, the Derivative Plaintiffs' standing as parties in interest in the bankruptcy sense is tenuous at best given the absence of any evidence that the Derivative Plaintiffs have any economic stake in the outcome of this chapter 11 case, inasmuch as there exists at least $1.7 billion of general unsecured debt ahead of them in the capital structure which would have first claim on the proceeds of any settlement of claims belonging to the estate. Nonetheless, the Court has fully considered the objections on the merits and overrules them for the following reasons.

**Applicable Law**

I note, as I did at each of the hearings on the proposed Rule 9019 settlement, that the decision to accept or reject a compromise or settlement is within the sound discretion of the bankruptcy court under Bankruptcy Rule 9019,[4] and that here in the Southern District of New York we apply the Iridium factors in evaluating a proposed settlement. Those factors are as follows:

(1) the balance between the litigation's possibility of success and the settlement's future benefits;
(2) the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay;
(3) the paramount interests of creditors;
(4) whether other parties in interest support the settlement;
(5) the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing the settlement;
(6) the nature and breadth of releases to be obtained by officers and directors; and
(7) the extent to which the settlement is the product of arm's length bargaining.

See Motorola, Inc v. Official Comm. Of Unsecured Creditors and JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 462 (2d Cir. 2007).

---

[4] Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides, in pertinent part, that "[o]n motion by the [debtor] and after notice and a hearing, the court may approve a compromise or settlement."

Perhaps the best formulation of how the Court should approach the task of evaluating a

settlement can be found in the Supreme Court's seminal decision in Protective Comm. for Indep.

Stockholders of TMT Trailer Ferry, Inc. v. Anderson:

> [The Court must] apprise [itself] of all facts necessary for an intelligent and
> objective opinion of the probabilities of ultimate success should the claim be
> litigated. Further, the judge should form an educated estimate of the complexity,
> expense, and likely duration of such litigation, the possible difficulties of
> collecting on any judgment which might be obtained, and all other factors
> relevant to a full and fair assessment of the wisdom of the proposed compromise.
> Basic to this process in every instance, of course, is the need to compare the terms
> of the compromise with the likely rewards of litigation.

390 U.S. 414, 424-25 (1968). In determining whether to approve a proposed settlement, courts

have held that a bankruptcy court need not "conduct a 'mini-trial' to determine the merits of the

underlying litigation" or the numerous issues of law and fact raised by the dispute and resolved

by the settlement. In re Ashford Hotels, Ltd., 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998).

"[T]he court's responsibilities are to 'familiarize itself with all facts necessary for an intelligent

and objective opinion, canvass the issues, and see whether the settlement falls below the lowest

point in the range of reasonableness.'" Id. (citations omitted); see also Norman v. Stein, 464

F.2d 689, 693 (2d Cir. 1972). Having conducted a two-day evidentiary hearing on the proposed

settlement and reviewed three rounds of submissions by the parties in connection with the three

hearings that have been held on the proposed settlement, the Court believes it has discharged its

obligation to familiarize itself with the facts relevant and necessary to its decision.

**Decision**

The Court will now address the merits of the objections of the Derivative Plaintiffs. With

respect to the first Iridium factor, and consistent with the requirements of SmartWorld, the

Debtor has made a substantial showing regarding its consideration of the merits of the claims

proposed to be settled and the likelihood of success on those claims. In connection with this

evaluation, the Debtor determined that there exist high barriers to recovery under Delaware law on the theoretical claims against Ambac's officers and directors which are to be released as part of the proposed settlement.  See In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d 106 (Del. Ch. 2009).  Only a finding of bad faith by the Debtor's directors could result in a monetary recovery to the estate, and the Debtor has concluded, after considering the extraordinary difficulty of proving bad faith on the part of a board which was composed of a majority of independent directors, that the derivative claims are of little to no value under controlling Delaware law.  Among other things, the Debtor (through the testimony of Mr. Ksenak and substantial documentary evidence) has pointed to the extensive systems, policies, and controls which it had in place during the relevant period and has argued convincingly that they are more than applicable law requires to rebut a claim of bad faith, gross negligence, or failure to exercise oversight, claims which are asserted in the derivative actions.  Specifically, for example, the Debtor demonstrated that its Forms 10-K for the years 2005 through 2007 each reflect Ambac's external auditor's determination that the controls in place at Ambac were adequate.

The level of transparency regarding its RMBS, CDO, and so-called CDO-squared exposures that was exhibited by Ambac during the relevant period also contradicts a conclusion of intentional wrongdoing or reckless concealment of information by Ambac's officers and directors.  Ambac, like dozens of other financial institutions, as well as the United States itself, fell prey to the myriad complex macroeconomic forces and market conditions that led to the subprime financial crisis.  As the Delaware Chancery Court stated in Citigroup, in words that are compellingly applicable here:

> Citigroup has suffered staggering losses, in part, as a result of the recent problems
> in the United States economy, particularly those in the subprime mortgage

market.  It is understandable that investors, and others, want to find someone to hold responsible for these losses, and it is often difficult to distinguish between a desire to blame *someone* and a desire to force those responsible to account for their wrongdoing.  Our law, fortunately, provides guidance for precisely these situations in the form of doctrines governing the duties owed by officers and directors of Delaware corporations.  This law has been refined over hundreds of years, which no doubt included many crises, and we must not let our desire to blame someone for our losses make us lose sight of the purpose of our law.  Ultimately, the discretion granted directors and managers allows them to maximize shareholder value in the long term by taking risks without the debilitating fear that they will be held personally liable if the company experiences losses.  This doctrine also means, however, that when the company suffers losses, shareholders may not be able to hold the directors personally liable.

In re Citigroup Inc. Shareholder Derivative Litigation, 964 A.2d at 139.

Ambac has also preliminarily established that the Derivative Plaintiffs' allegations regarding the sales of stock by Ambac officers and directors during the relevant period and the claims related to those allegations appear unlikely to have merit.  At the September 8 hearing, Mr. Ksenak provided a plausible explanation for the timing of the stock sales by the defendant officers and directors and also provided documentary evidence that purchases of stock by such individuals continued both during and after the relevant time period.  Further, unlike some companies, Ambac has not been required to restate any of its audited financial statements from the relevant time period.  No government enforcement proceedings have been commenced against any Ambac director or officer relating to the 2006-2009 time period, nor have any such individuals been charged with insider trading or other criminal wrongdoing.

In arguing that the likelihood of success on the derivative claims and the magnitude of potential damages renders the release of those claims unfair, the Derivative Plaintiffs mistakenly equate what they view as Ambac's losses from its exposure to the CDO and CDO-squared market with any demonstration that the defendant officers and directors caused those losses; no such nexus has been established.  Indeed, beyond pointing to the well-pled allegations of its

complaint and the largely irrelevant fact that the complaint in the Securities Litigation survived a motion to dismiss in the District Court, PFRS has entirely failed to address the issue of likelihood of success on the merits of the derivative claims.  Moreover, even assuming certain of these claims had merit, the Court is convinced that pursuing such claims would not result in a net benefit to the estate.  The Derivative Plaintiffs posit that "[o]ne would think that the estate would be better off in any situation in which it was able to obtain more than the cost of pursing [sic] the claims."  One would indeed, but it is the Debtor's (and the Creditors' Committee's) view that this is not such a situation.  The Court agrees.  Nothing in Iridium or other applicable case law requires a debtor to gamble with the estate's interest at the behest of an out-of-the-money party who has nothing to lose by a roll of the litigation dice.

The Derivative Plaintiffs further argue that because their proffered expert, Lawrence Weiss, estimates "damages" from the Derivative Actions to be in the range of $15.6 to $17.1 billion, the Court should not approve the proposed settlement; they have not, however, presented any evidence showing a likelihood of success in the Derivative Actions which would yield this extraordinary level of recovery or any level of monetary recovery which would establish that the Debtor's evaluation of the proposed settlement does not pass muster under the first prong of Iridium.

On cross-examination, Dr. Weiss admitted that he has never valued a public company, a bond insurer, or a financial guarantee company.  Dr. Weiss also confirmed that, in preparing his expert report, he performed no evaluation of the merits of the Derivative Actions, and that his estimated damages amount was merely calculated by comparing the current value of Ambac with the "hypothetical" value of what Ambac "might" be worth had it not guaranteed CDOs and CDO-squareds.  His testimony also revealed that, in calculating this hypothetical value, Dr.

10

Weiss relied on assumptions that did not take into account, among other things, the general recession affecting the United States, the effect of the loss of Ambac's and other bond insurers' AAA credit ratings, or the fact that the market for guarantees for non-CDO mortgage backed securities has suffered substantial losses and has primarily dried up at this time.  Simply put, the assumptions on which Dr. Weiss's opinion are based are highly flawed and at odds with reality.

At best, Dr. Weiss's expert report and testimony must be viewed as a mechanical and legally irrelevant mathematical analysis of Ambac's balance sheet and the effect of its CDO and CDO-squared exposure; it speaks not at all to whether the defendants in the Derivative Actions can, as a matter of Delaware law, be held liable.  While the Court is sympathetic to the Derivative Plaintiffs' understandable desire to blame someone for the staggering losses Ambac sustained, neither the strength of that desire nor the magnitude of the losses suffered equates to a demonstration of causation or legal liability.

The second Iridium factor — the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay — also favors the proposed settlement.  It is without serious dispute that, in the absence of the proposed settlement, litigation of the Securities Litigation and the Derivative Actions could continue for several years, during which time such costs and delays would continue.  The Debtor has demonstrated that (contrary to the assertions of PFRS) its estate is receiving value for the release of the derivative claims through the settlement by (i) avoiding the significant legal costs in the actions (approximately $20 million, according to Mr. Ksenak's testimony) which would well exceed the $2.5M that the Debtor will pay in connection with the settlement and (ii) enabling the Debtor's management to continue to work toward the Debtor's reorganization instead of focusing their attention on litigation-related

11

activities which could delay such reorganization and cause the Debtor to, among other things, incur substantial administrative expenses.

In considering the third <u>Iridium</u> factor — the paramount interests of creditors — the Court concludes that the support of the Creditors' Committee here weighs heavily in favor of approval of the proposed settlement. The Debtor's over $1.7 billion in unsecured creditors have spoken: they support the settlement. These unsecured creditors stand ahead of the Derivative Plaintiffs in the Debtor's capital structure, and, under the absolute priority rule, they are the constituency which would stand to benefit from any recovery in the Derivative Actions brought on behalf of the Debtor, not the structurally subordinated Derivative Plaintiffs who are not currently slated to receive any distribution from the Debtor's estate. Stated differently, even if the Derivative Actions could be successfully litigated to judgment or a more lucrative settlement, an amount in excess of $1.7 billion would have to be recovered from the insurers and the individual defendants in order for the Derivative Plaintiffs to receive any potential recovery. Based on the information disclosed on a confidential basis to the Court regarding the insurance coverage available to the Ambac director and officer defendants, while some additional coverage does exist beyond the $24.6 million proposed to be paid in connection with the Settlement Stipulation and Insurer Agreement, the amount of available coverage does not nearly reach beyond the amount of the unsecured claims against the Debtor. The fact that there may be additional available insurance coverage (or, as the Derivative Plaintiffs have speculated, some other assets flowing to the Debtor's estate from non-debtors or other litigation recoveries) is not relevant to the Court's determination pursuant to Bankruptcy Rule 9019 as to the reasonableness of the proposed settlement.

In addition, it is abundantly clear that if there was any possibility of a more lucrative settlement of the Securities Litigation and/or the Derivative Actions, the Creditors' Committee, after performing its own independent analysis, would have objected to the settlement proposed by the Debtor. Despite repeated requests by the Court to do so, the Derivative Plaintiffs have not put forth any theory as to why the Creditors' Committee would ignore the possibility of any reasonable settlement which would be more favorable to their constituency. Notwithstanding the Derivative Plaintiffs' arguments and observations about the possible conflicting interests of the Debtor's Board members and their counsel, I find that the Creditors' Committee serves as a very reliable check on the business judgment of the Debtor, and I place far greater weight on the Committee's support for the settlement than the views of the Derivative Plaintiffs who have nothing at stake in terms of potential recovery in the bankruptcy case. There is absolutely no evidence in the record that the Creditors' Committee's determination is in any way tainted; its support for the proposed settlement is dispositive of both the third and fourth Iridium factors.

Regarding the sixth Iridium factor — the nature and breadth of releases to be obtained by officers and directors — the Debtor has established that it has determined, in the exercise of its business judgment, that the injunctions and releases being given through the proposed settlement are appropriate in nature and scope and that the settlement would not be achievable without such provisions. The Debtor submits that the settling parties have conditioned the effectiveness of the settlement upon the Court's approval of the release and injunction provisions and that the D&O insurers are unwilling to pay their portion of the settlement amount absent such approval. The Creditors' Committee has also conducted its own independent analysis of these provisions and supports them as a component of the overall settlement. I note that the releases and injunctions are one integral aspect of a multi-faceted settlement, and I find no reason to disagree with the

13

Debtor's business judgment in evaluating the appropriateness of such releases and injunctions in connection with the overall settlement.

The Court concludes that the seventh Iridium factor — the extent to which the settlement is the product of arm's length bargaining — has indisputably been met.  There has been no evidence presented that the settlement, achieved through numerous mediation sessions taking place under the watchful eye of retired District Judge Nicholas Politan over the course of more than one year, was the result of anything other than arm's length negotiating.  The involvement of the Creditors' Committee as an independent fiduciary and its support for the settlement also supports my finding in this regard.  The fact that the Derivative Plaintiffs did not participate in the mediation sessions or settlement discussions does not alter this conclusion.

After considering the evidence presented, I am satisfied that the proposed settlement passes muster under the Iridium factors and falls well above the lowest point in the range of reasonableness.  The Court finds that the Debtor has made a reasonable business judgment that, among other things, the claims asserted in the Derivative Actions lack merit, and that, even if those claims did have merit, the Debtor has exercised sound business judgment in determining that such claims are not worth pursuing and that the settlement is fair and equitable and in the best interest of the estate.

Finally, there is no merit to the Derivative Plaintiffs' argument that under the Supreme Court's recent decision in Stern v. Marshall, 131 S. Ct. 2594 (2011), I should "abstain" from deciding the claims at issue in the Derivative Actions.  The Debtor is not asking this Court to hear and adjudicate these claims.  As the Debtor accurately observed in its Supplemental Brief,

> This argument results from a misreading of Stern v. Marshall. That case has nothing to do with the Court's in rem jurisdiction to administer property of the estate.  The 'narrow' issue in Stern was whether a bankruptcy court had subject matter jurisdiction to *hear and finally resolve* a debtor's counterclaim against a

> third party. <u>See</u> <u>Stern v. Marshall</u>, 131 S. Ct. 2594. Here, the Debtor does not
> seek to try the Derivative Actions in the bankruptcy court. Instead, the Debtor
> seeks this Court's approval of its disposition of the claims at issue in the
> Derivative Actions, assets which are property of the Debtor's estate.

<u>See</u> Debtor's Supplemental Brief [Docket No. 548] at ¶ 27; <u>see also</u> <u>Safety Harbor Resort & Spa</u>,

2011 Bankr. LEXIS 3238, *2-3 (M.D. Fla. 2011) (discussing narrow scope of <u>Stern</u>). This is the

correct view of <u>Stern v. Marshall</u> and of the Court's jurisdiction and constitutional authority in

this case. Unfortunately, <u>Stern v. Marshall</u> has become the mantra of every litigant who, for

strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court.

Whatever <u>Stern v. Marshall</u> may ultimately be held to mean, this Court is confident that, as a

matter of law and practice, it most certainly does not stand for the proposition that the

bankruptcy court cannot approve the compromise and settlement of a claim which is indisputably

property of a debtor's estate.

　　　　For these reasons and based on the entirety of the record of the hearings held on (i) July

19, 2011, (ii) August 10, 2011, and (iii) September 8 and 9, 2011, the Court overrules the

Derivative Plaintiffs' objections and will enter the Amended Order.[5]

Dated:　September 23, 2011
　　　　　New York, New York

　　　　　　　　　　　　　　　　　　　　　　　　　　　/s/ Shelley C. Chapman
　　　　　　　　　　　　　　　　　　　　　　　　　　　United States Bankruptcy Judge

---

[5]　　　On September 13, 2011, the Court entered the Amended Order [Docket No. 558].

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 14, 2011 I caused a copy of the foregoing Police and Fire Retirement System of the City of Detroit's Brief in Support of its Appeal of the Amended 9019 Order to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel of record in this matter who are registered on the CM/ECF system.

*s/ Denis F. Sheils*
Kohn, Swift & Graf, PC
Denis F. Sheils
One South Broad Street, Suite 2100
Philadelphia, PA 19107