```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
In re

AMBAC FINANCIAL GROUP, INC.,              10-B-15973 (SCC)

                Debtor.
----------------------------------X
POLICE & FIRE RETIREMENT SYSTEM OF
THE CITY OF DETROIT,

                Appellant,               **MEMORANDUM AND ORDER**

        - against -                       11 Civ. 7529 (NRB)

AMBAC FINANCIAL GROUP, INC.,

                Appellee.
----------------------------------X
```

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

Appellant Police and Fire Retirement System of the City of Detroit ("PFRS" or "Appellant") appeals from a decision of the United States Bankruptcy Court (Chapman, J.) (the "Bankruptcy Court"), approving a settlement agreement (the "Settlement") pursuant to Bankruptcy Rule 9019 between Ambac Financial Group, Inc. ("Ambac") and plaintiffs in two shareholder class action lawsuits. For the reasons set forth below, the Bankruptcy Court's order is affirmed.

**BACKGROUND**[1]

On November 8, 2010, Ambac filed a voluntary petition under Chapter 11 of the Bankruptcy Code. (PFRS Br. at 5.) Upon the filing of this petition, a mandatory stay was imposed pursuant to Section 362 of the Bankruptcy Code on all actions then pending against Ambac and its officers and directors. (Id.) The actions filed prior to the bankruptcy petition included two shareholder derivative actions – one filed by Appellant in the Chancery Court of Delaware (the "Delaware Action") and one filed in the Southern District of New York[2] (the "New York Action" and collectively, the "Derivative Actions") – and two shareholder class actions.[3] All of these actions asserted claims in connection with losses suffered by Ambac as a result of its exposure to the subprime mortgage financial crisis.

---

[1] The following facts are drawn from the Police and Fire Retirement System of the City of Detroit's Brief in Support of Its Appeal of the Amended 9019 Order ("PFRS Br."), filed November 14, 2011, the Brief for Appellee Ambac Financial Group, Inc. ("Ambac Br."), filed December 2, 2011, the Reply Memorandum of Law in Further Support of Police and Fire Retirement System of the City of Detroit's Appeal from the Amended 9019 Order ("PFRS Reply Br."), filed December 15, 2011, and the Bankruptcy Court's Bench Decision Approving Settlement Stipulation and Insurer Agreement, In re Ambac Financial Group, Inc., 457 B.R. 299 (Bankr. S.D.N.Y. 2011) ("Bench Decision").

[2] These actions were captioned In re Ambac Financial Group, Inc. Shareholders Derivative Litigation, C.A. No. 3521-VCL (Del. Ch.) and In re Ambac Financial Group, Inc. Derivative Litigation, No. 08 Civ. 854 (S.D.N.Y.). On December 30, 2008, Vice Chancellor Lamb stayed the Delaware Action in favor of the New York Action, and thus at the time of the bankruptcy petition, the New York Action was the only derivative action then pending.

[3] These actions were captioned In re Ambac Financial Group, Inc. Securities Litigation, No. 08 Civ. 411 (NRB) (S.D.N.Y.) and Tolin v. Ambac Financial Group, Inc., No. 08 Civ. 11241 (CM) (S.D.N.Y.).

In May 2011 – following a year of mediation efforts led by retired District Judge Nicholas Politan - plaintiffs in the securities class actions entered into a Stipulation of Settlement with Ambac. (Ambac Br. at 4-5.) See also Bench Decision, 457 B.R. at 307. The Settlement resolved the parties' claims, but it was conditioned on receiving an order from the Bankruptcy Court releasing and barring the claims asserted in the shareholder derivative actions against Ambac's officers and directors.[4] (Ambac Br. at 4-5.) On June 28, 2011, Ambac filed a motion requesting that the Bankruptcy Court enter an order under Bankruptcy Rule 9019 approving the Settlement with the above stated conditions ("9019 Order").[5] (Id. at 5.)

On July 27, 2011, PFRS filed an objection to the proposed order. (PFRS Br. at 5-6.)[6] On August 10, 2011, the Bankruptcy Court held a hearing at which PFRS requested that it be afforded

---

[4] The Settlement provides for a recovery to the class action plaintiffs of $27.1 million. $2.5 million of this sum is to be paid by Ambac, and the remaining $24.6 million is to be paid by Ambac's director and officer liability insurers. See Am. Order, Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 9019, (A) Approving the Settlement Stipulation and the Insurer Agreement and (B) Approving Ambac's Entry into the Settlement Stipulation and Insurer Agreement and Performance of All of Its Obligations Thereunder, Ex. 1, In re Ambac Fin. Grp., Inc., No. 10-15973 (SCC) (Bankr. S.D.N.Y. Sept. 13, 2011), Docket no. 558.

[5] Rule 9019 provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

[6] The Bankruptcy Court had initially approved the requested order on July 19, 2011, but the Bankruptcy Court later learned that plaintiffs in the Derivative Actions had not been properly served with the motion requesting the order. Bench Decision, 457 B.R. at 301. Ambac filed a notice of presentment of the requested order on July 25, 2011, and PFRS filed its objection two days later. See id.

3

an opportunity to conduct discovery and present evidence as to why the Settlement should not be approved. Bench Decision, 457 B.R. at 301. The Bankruptcy Court granted PFRS's request, and, a month later, the Court held a two-day evidentiary hearing on the motion. Id. at 302. At the hearing, Ambac's general counsel, Stephen Ksenak, testified as to the reasons Ambac felt the settlement terms were appropriate, and PFRS presented expert testimony from Dr. Lawrence Weiss as to the potential damages underlying the released claims. (Ambac Br. at 6.) Notably, counsel for the Official Committee of Unsecured Creditors ("Creditors Committee") participated at the hearing and expressed support for entry of the requested order. (Id.)

On September 13, 2011, the Bankruptcy Court entered the 9019 Order over PFRS's objections. Applying the seven-factor test outlined by the Second Circuit in Motorola, Inc. v. Official Committee of Unsecured Creditors (In re Iridium Operating LLC) ("Iridium"), 478 F.3d 452 (2d Cir. 2007), the Court found that the Settlement fell "well above the lowest point in the range of reasonableness" and its approval was thus warranted. Bench Decision, 457 B.R. at 308. The instant appeal followed.[7]

---

[7] On September 28, 2011, this Court granted final approval of two settlements reached in the class action lawsuits. One of those settlements – with Ambac and its officers and directors – is the same agreement that is the subject of the instant appeal, and the other settlement was entered into between plaintiffs and underwriter defendants for nearly $6 million. At a final

**LEGAL STANDARDS**

We review <u>de novo</u> the Bankruptcy Court's articulation of the legal standards applicable to evaluation of a settlement under Rule 9019. <u>Krys v. Official Comm. of Unsecured Creditors of Refco Inc. (In re Refco Inc.)</u>, 505 F.3d 109, 116 (2d Cir. 2007). However, we review the Bankruptcy Court's application of those legal principles to the settlement in question for abuse of discretion. <u>Id.</u>; <u>see also</u> <u>Iridium</u>, 478 F.3d at 461 n.13. The Bankruptcy Court "will have abused its discretion if no reasonable man could agree with the decision to approve [the] settlement." <u>Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.)</u>, 374 B.R. 516, 522 (S.D.N.Y. 2007) (internal quotation marks omitted).

In engaging in this review, we are mindful that settlements are strongly favored in the bankruptcy context, as they "help clear a path for the efficient administration of the bankrupt estate." <u>Iridium</u>, 478 F.3d at 455; <u>see also</u> <u>O'Connell v. Packles (In re Hilsen)</u>, 404 B.R. 58, 69 (Bankr. E.D.N.Y. 2009). Thus, courts are to upset such settlements only in the face of considerable evidence suggesting that the agreement is unreasonable. <u>See</u> <u>In re Hilsen</u>, 404 B.R. at 70 ("[T]he court

---

fairness hearing held by this Court on September 28, 2011 in connection with these two settlements, PFRS appeared as the sole objector to the settlements and presented substantially similar arguments to those made on the instant appeal. PFRS has filed an appeal of this Court's September 28, 2011 order approving the settlements, and PFRS's brief to the Second Circuit in the matter is due February 10, 2012.

must do neither more nor less than canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness from the perspective of the bankruptcy estate." (internal quotation marks omitted)).

## DISCUSSION

### I. Scope of Release

PFRS contends that Ambac did not have the authority to release the derivative claims as part of the Settlement with the class action plaintiffs. We find this argument to be without merit.

Pursuant to Section 541 of the Bankruptcy Code, all causes of action held by the debtor become the exclusive property of the bankruptcy estate upon commencement of bankruptcy proceedings. See 11 U.S.C. § 541(a); see also Seinfeld v. Allen, 169 F. App'x 47, 49 (2d Cir. 2006). Any derivative claims held by individual shareholders therefore accrued to Ambac, in its role as debtor-in-possession, upon the filing of the bankruptcy petition. See iXL Enters., Inc. v. GE Capital Corp., 167 F. App'x 824, 826 (2d Cir. 2006). That the Derivative Actions were filed prior to Ambac's filing for bankruptcy protection is irrelevant to the operation of this regime. Id. at 827 n.2.

Given a debtor-in-possession's control over an estate's causes of action, it naturally follows – and has been explicitly stated by the Second Circuit - that the debtor-in-possession is

6

"vested with the power to settle the estate's claims." Smart World Techs., LLC v. Juno Online Servs., Inc. (In re Smart World Techs., LLC), 423 F.3d 166, 175 (2d Cir. 2005); see also Sobchack v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.), 17 F.3d 600, 607 (2d Cir. 1994); Morley v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427, 433 (1st Cir. 2007).[8] Ambac, as debtor-in-possession, thus maintained the authority to settle the derivative claims if it deemed that choice to be the proper course of action, and as such, its decision to settle the claims was not ultra vires.

PFRS incorrectly suggests that the Second Circuit's opinion in National Super Spuds, Inc. v. New York Mercantile Exchange, 660 F.2d 9 (2d Cir. 1981), dictates a holding to the contrary. In National Super Spuds, the class action plaintiffs asserted claims against the defendant based on contracts that were liquidated prior to a certain date. See id. at 13-14. Under the proposed settlement, class members were precluded from bringing future claims not only related to these liquidated contracts, but also in relation to contracts that were unliquidated as of the relevant date. See id. at 14. The court held this release to be impermissibly broad, explaining that "the parties to the settlement have attempted to release claims with respect to

---

[8] While the latter two of these cases discuss the authority of trustees to settle derivative claims on behalf of the estate, by statute, "a debtor in possession shall have all the rights . . . and powers, and shall perform all the functions and duties . . . of a trustee." 11 U.S.C. § 1107(a).

7

which none of them was authorized to represent members of the class." Id. at 19.

The principles articulated in National Super Spuds are inapposite to the present matter. Unlike the plaintiffs in National Super Spuds, Ambac did have the power to release the claims in question because, as explained above, those claims were the exclusive property of the debtor-in-possession. Rather than releasing claims over which it had no authority, Ambac settled claims that were entirely within its province.

## II.  Abandonment of Derivative Claims

PFRS next suggests that it should be permitted to pursue the derivative claims on behalf of the bankruptcy estate because Ambac has "effectively abandoned" those claims. We reject this argument for substantially the same reasons articulated above.

As previously described, causes of actions held by a debtor against its officers and directors are generally enforceable only by the debtor-in-possession or the court-appointed trustee of the estate. See Seinfeld, 169 F. App'x at 49. The Second Circuit has recognized two exceptions to this proposition: (1) when the debtor-in-possession or trustee abandons the claim, or (2) when the bankruptcy court orders the debtor-in-possession or trustee to abandon the claim. See id. (citing Mitchell Excavators, Inc. v. Mitchell, 734 F.2d 129, 131-32 (2d Cir. 1984)). PFRS contends that the first of these exceptions should

apply because Ambac has effectively abandoned the derivative claims by agreeing to their release in the Settlement.

We are unable to accept PFRS's position. Rather than abandon its claims, Ambac settled those claims on terms that the Bankruptcy Court deemed reasonable, and, as explained in detail <u>infra</u>, we find that the Bankruptcy Court did not abuse its discretion in making this determination. Moreover, we reject PFRS's position that the derivative claims should be considered abandoned simply because there are directors named in the Derivative Actions who continue to serve on the Ambac board. Such a position, if accepted, would essentially render null the previously established power of a debtor-in-possession to settle the claims held by a bankruptcy estate.

### III. **Merits of the Settlement**

The Bankruptcy Court appropriately reviewed the merits of the Settlement under the seven-factor test outlined by the Second Circuit in <u>Iridium</u>. These factors are: (1) the balance between the litigation's possibility of success and the settlement's future benefits; (2) the likelihood of complex and protracted litigation; (3) the paramount interests of the creditors, including the degree to which creditors either do not object to or affirmatively support the proposed settlement; (4) whether other parties in interest support the settlement; (5) the competency and experience of counsel supporting the

9

settlement and the experience and knowledge of the bankruptcy court judge reviewing the settlement; (6) the nature and breadth of releases to be obtained by officers and directors; and (7) the extent to which the settlement is the product of arm's length bargaining. Iridium, 478 F.3d at 462.

PFRS objects to the Bankruptcy Court's analysis with respect to several of these factors. In particular, PFRS objects to the Bankruptcy Court's evaluation of the derivative claims' likelihood of success, the weight afforded to the views of the Creditors Committee, and the deference shown to the business judgment of Ambac in deciding to release the derivative claims. Each of these objections is addressed below.

### A. Likelihood of Success

PFRS contends that the Bankruptcy Court made an incorrect application of Delaware law in evaluating the likelihood of success of the derivative claims.[9] Specifically, PFRS argues that the Bankruptcy Court erred in focusing on the barriers derivative plaintiffs would face in demonstrating that Ambac's directors acted in bad faith. PFRS maintains that while such an

---

[9] We reject PFRS's suggestion that the Bankruptcy Court should have assessed the viability of the derivative claims under the standards applicable to a motion to dismiss (as articulated in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). PFRS provides absolutely no authority to support this contention. The Second Circuit in Iridium clearly envisaged that courts reviewing a settlement under Rule 9019 would assess the "possibility of success" of the underlying claim in terms of an ultimate resolution of the claim, not the possibility that the claim would merely survive a motion to dismiss. See Iridium, 478 F.3d at 465 (citing approvingly the bankruptcy court's consideration under this factor of "the risk of establishing liability and damages at trial").

analysis is appropriate for claims alleging board inaction – such as the claims addressed by the Delaware Chancery Court in <u>In re Citigroup Inc. Shareholder Derivative Litigation</u> ("<u>Citigroup</u>"), 964 A.2d 106 (Del. Ch. 2009) – PFRS's complaint in the Delaware Action challenged specific affirmative actions by Ambac's directors. PFRS asserts that for such claims, the "more permissive pleading standards" of <u>Aronson v. Lewis</u>, 473 A.2d 805 (Del. 1984), are the appropriate rubric for evaluating the claims' likelihood of success.

This argument fails for several reasons. First, a review of the amended complaint in the Delaware Action reveals that, contrary to PFRS's assertions, its complaint was centered largely on an alleged failure of Ambac's directors to provide adequate oversight. PFRS's claims were thus similar in nature to those asserted in <u>Citigroup</u>. <u>See</u> Compl. ¶ 138, Delaware Action ("The Individual Defendants breached their fiduciary duties by failing to monitor the practices of Ambac [and] implement sufficient internal controls to guard against the wrongful practices and conduct . . . which they knew or should have known . . . ."); <u>see also</u> <u>In re Ambac Fin. Grp., Inc. S'holder Derivative Litig.</u>, C.A. No. 3521-VCL, 2008 WL 5481995, at *1 (Del. Ch. Dec. 30, 2008) (noting that PFRS brought claims in the Delaware Action premised on the failure of oversight theory of

11

liability established in In re Caremark International Inc. Derivative Litigation, 698 A.2d 959 (Del. Ch. 1996)).

Even if PFRS did assert claims falling under the Aronson framework, the two-prong test outlined in Aronson and cited by PFRS in its brief concerns the standards for demonstrating demand futility in a derivative suit, not for ultimately establishing liability for breach of fiduciary duty.[10] As already mentioned, analysis under this Iridium factor focuses on the likelihood of success on the merits in terms of an eventual monetary recovery, and thus the only relevant concern is whether a plaintiff would be able to establish the actual bases for its claims - in this case breach of a fiduciary duty. Demonstrating demand futility would be merely a threshold step before this ultimate issue would be decided.

Given these considerations, the Bankruptcy Court did not err in analogizing to Citigroup and focusing on the hurdle of proving bad faith conduct by Ambac's directors.[11] Having employed

---

[10] Under Aronson, demand futility is established if there is a reasonable doubt that: (1) "the directors are disinterested and independent," or (2) "the challenged transaction was otherwise the product of a valid exercise of business judgment." Aronson, 473 A.2d at 814.

[11] Ambac has a broad exculpatory provision in its charter for director liability pursuant to 8 Del. C. § 102(b)(7). See In re Ambac Fin. Grp., Inc. Derivative Litig., No. 08 Civ. 854 (SHS), Docket no. 22, Ex. 1. Given the Section 102(b)(7) provision, demonstrating bad faith conduct would be key to establishing a breach of fiduciary duty by the directors. See In re Citigroup Inc. S'holder Derivative Litig., No. 07 Civ. 9841, 2009 WL 2610746, at *9 (S.D.N.Y. Aug. 25, 2009). We also note that PFRS would likely be unable to establish its claim for corporate waste based on Ambac's stock repurchase, as the difficult standard for demonstrating waste could likely not be met given

12

the appropriate legal standard, we find that the Bankruptcy Court did not abuse its discretion in determining that, based on the available evidence, "the derivative claims are of little to no value under controlling Delaware law." Bench Decision, 457 B.R. at 304. The Bankruptcy Court came to this conclusion after considering the internal controls Ambac had in place during the period in question and the outcome of litigation that has been predicated on similar factual circumstances. Moreover, the Bankruptcy Court made its assessment after the benefit of a two-day evidentiary hearing, at which it was able to hear evidence concerning the sufficiency of Ambac's internal controls as well as weigh – and ultimately reject - the testimony of PFRS's expert witness concerning the potential damages associated with the derivative claims. We concur with the Bankruptcy Court's rejection of Dr. Weiss's unsubstantiated calculations,[12] and we have little hesitation in holding that the Bankruptcy Court did not abuse its discretion in assessing the likelihood of success of the derivative claims.

---

that the stock re-purchase was at a price "at which ordinary and rational businesspeople were trading the stock." Id. at *8.

[12] Dr. Weiss' calculations estimated Ambac's hypothetical current value had it not engaged in the challenged behavior. Amongst other deficiencies, Dr. Weiss admitted in his testimony that he had not taken into consideration the general recession affecting the U.S. economy (or Ambac's line of business specifically), nor had he calibrated his calculations based on the legal standards applicable to the derivative claims.

B. **Likelihood of Complex and Protracted Litigation**

Although PFRS does not challenge the Bankruptcy Court's analysis under this second Iridium factor, we find consideration of the factor nevertheless important to our review of the reasonableness of the Settlement as a whole.

As noted by the Bankruptcy Court, litigation of the securities class action claims and the derivative claims would likely continue for many years, at a substantial cost to the parties. In fact, Ambac's general counsel Ksenak testified at the Bankruptcy Court hearing that, in the absence of the Settlement, litigating both sets of claims could cost Ambac approximately $20 million. Settlement, in contrast, "eliminates uncertainty and delay, reduces costs, and brings finality to the parties' dispute." In re Hilsen, 404 B.R. at 71. The finality that accompanies settlement is of particular importance in the bankruptcy context, as effectuating a prompt and orderly administration of the estate is a central objective of the bankruptcy system. See id. at 75. We thus agree with the Bankruptcy Court's conclusion that this factor weighs strongly in favor of the Settlement.

C. **Paramount Interest of Creditors**

PFRS contests the degree of deference afforded by the Bankruptcy Court to the Creditors Committee in its support for the 9019 Order. PFRS suggests that the Creditors Committee was

14

not involved in the negotiations and finalization of the Settlement, and therefore the Creditors Committee should not be considered a reliable check on the judgment of Ambac in entering into the agreement. Ambac refutes this notion, arguing that the Creditors Committee did in fact take an active role in shaping the terms of the Settlement.

The precise role of the Creditors Committee in fashioning the Settlement is of limited importance for present purposes. As noted by the Bankruptcy Court, the unsecured creditors – holding over $1.7 billion in claims - are the parties who stand to benefit from any recovery in the Derivative Actions. <u>Bench Decision</u>, 457 B.R. at 306-07 ("[E]ven if the Derivative Actions could be successfully litigated to judgment or a more lucrative settlement, an amount in excess of $1.7 billion would have to be recovered . . . in order for the Derivative Plaintiffs to receive any potential recovery."). Regardless of how involved the Creditors Committee may have been in negotiating the Settlement, it was aware of the final terms of the agreement and had every incentive to object if it believed that more favorable terms could be reached in favor of the estate. The Bankruptcy Court was therefore justified in placing significant weight on the Creditors Committee's support for the 9019 Order.

15

### D. Nature and Breadth of Releases Obtained

With respect to the sixth Iridium factor, PFRS objects to the Bankruptcy Court's deference to the business judgment of Ambac in releasing the derivative claims. PFRS contends that Ambac's business judgment is not entitled to deference in this matter because seven of Ambac's current directors were defendants in the Delaware Action. PFRS further suggests that Ambac's general counsel, Ksenak, was not competent to provide testimony at the evidentiary hearing because he did not personally participate in the negotiation process, having been appointed general counsel only in July 2011.

We note as an initial matter that the Bankruptcy Court did not blindly defer to Ambac's business judgment in approving the Settlement, but rather it considered Ambac's decision in the context of the other Iridium factors thus far discussed (and discussed infra). In addition, we reiterate that the Bankruptcy Court considered the merits of Ambac's decision after a two-day evidentiary hearing at which Ksenak explained Ambac's justifications for entering into the agreement as well as the steps he had personally taken to become knowledgeable on the matter.

As for PFRS's contention concerning the interested nature of Ambac's directors, this position, if accepted, would undermine the ability of a debtor-in-possession to make

16

reasonable business judgments regarding the settlement of claims, a power the debtor-in-possession clearly maintains. This is not to suggest that a debtor-in-possession's decision to release claims is dispositive, as we would certainly take account of any evidence suggesting that the terms of a settlement are unreasonable. However, PFRS has not provided significant evidence suggesting that Ambac made an unreasonable business judgment in releasing the derivative claims as part of the broader Settlement.

### E. Extent to Which the Settlement is a Product of Arm's Length Bargaining

In addressing this final <u>Iridium</u> factor, the Bankruptcy Court noted that the Settlement was achieved after a series of mediation sessions spanning over a full year and presided over by retired District Judge Nicholas Politan. The Bankruptcy Court found, and we concur, that these facts strongly suggest that the Settlement was the product of vigorous negotiation.

### F. Summary

After considering the pertinent <u>Iridium</u> factors, we find that the Bankruptcy Court did not abuse its discretion in finding that the Settlement was within the range of reasonableness and its approval was appropriate.

**IV. <u>Jurisdiction of the Bankruptcy Court</u>**

In a final effort to upend the 9019 Order, PFRS contends that the Bankruptcy Court did not have the constitutional authority to resolve the shareholder derivative claims under the Supreme Court's recent decision in <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011).

In <u>Stern</u>, the Supreme Court addressed the authority of a Bankruptcy Court to adjudicate a state law counterclaim asserted by the estate against a party that had filed a proof of claim. <u>See</u> <u>id.</u> at 2601. The Court held that a bankruptcy court did not have the constitutional authority to enter a final, binding judgment on such a claim. <u>See</u> <u>id.</u> at 2615.

The full reach of <u>Stern</u> has yet to be determined, but it is clear that the case does not implicate the approval of settlements, relating to property of the debtor's estate, under Rule 9019. It suffices to note that there is a fundamental difference between a court's entry of a final, binding judgment on the merits of a claim and its approval of a settlement of that claim. <u>In re Wash. Mut.</u>, No. 08-12229 (MFW), 2011 WL 4090757, at *4 (Bankr. D. Del. Sept. 13, 2011) (citing <u>Matsushita Elec. Indus. Co. v. Epstein</u>, 516 U.S. 367, 382 (1996)); <u>see also</u> <u>Stern</u>, 131 S. Ct. at 2615 (emphasizing that "the entry of a final, binding judgment" is an exercise of judicial power). While <u>Stern</u> may implicate a bankruptcy court's

18

authority to effectuate the former, it does not affect the court's ability to engage in the latter. Indeed, the permissive standard that bankruptcy courts apply in reviewing settlements under Rule 9019 – whether the settlement is above "the lowest point in the range of reasonableness" – illuminates the distinct nature of settlement review as compared to final adjudication. In re Wash. Mut., 2011 WL 4090757, at *5. Thus, there was no constitutional infirmity in the bankruptcy court's issuance of the 9019 Order.[13]

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's 9019 Order is affirmed.

**SO ORDERED.**


Dated:   New York, New York
         December 28, 2011

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

---

[13] We also note, but need not explore in detail, the consensus view that the holding of Stern was narrow and was very much based on the unique circumstances presented in the case. See In re Salander O'reilly Galleries, 453 B.R. 106, 115-16 (Bankr. S.D.N.Y. 2011).

19

Copies of the foregoing Order have been mailed on this date to the following:

**Attorney for Appellant:**
Denis F. Sheils, Esq.
Kohn, Swift & Graf, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107

**Attorneys for Appellee:**
Allison H. Weiss, Esq.
Dewey & LeBoeuf LLP
125 West 55th Street
New York, NY 100019

Bennett G. Young, Esq.
Dewey & LeBoeuf LLP
Post Montgomery Center
One Montgomery Street, Suite 3500
San Francisco, CA 94104